Rudolph L. Gross and Catherine D. Gross v. Commissioner.
Gross v. Commissioner
Docket No. 5035-65.
United States Tax Court
T.C. Memo 1967-31; 1967 Tax Ct. Memo LEXIS 231; 26 T.C.M. (CCH) 156; T.C.M. (RIA) 67031; February 16, 1967
Dean M. Alexander, 216 Mohawk Bldg., Portland, Ore., for the petitioners. Norman H. McNeil, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioners' income tax *232 for 1958, 1960 and 1961 in the respective amounts of $17,208.28, $1,686.81 and $6,493.07. Petitioners raised no issue in their petition with respect to respondent's determination of deficiency for the year 1960. Petitioners paid that deficiency and they have filed claim for refund with the district director of internal revenue. In their income tax return for 1961, petitioners claimed business bad debt deductions in the total sum of $69,880.47 which respondent disallowed as business bad debts and the correctness of this disallowance is the only issue in this case. Petitioner claimed the 1961 bad debt deduction resulted in a business loss of $66,183.51 which they carried back to 1958. By filing the appropriate application they received a tentative carryback adjustment and refund of 1958 taxes so the only issue for 1958 is the amount of the carryback adjustment, if any, for 1958 which will turn on the correctness of respondent's disallowance of the 1961 business bad debt deductions. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Petitioners are husband and wife and they reside in Portland, Oregon. They filed their income tax returns for *233 the periods here involved with the district director of internal revenue at Portland. Rudolph L. Gross had some experience prior to World War II working for finance companies making consumer loans. After his discharge from the Navy in October 1945 he went to work for the United States National Bank in Portland in the Consumer Finance Department. In 1947 he left the bank and he and a man named White organized a company called Aero Credit Corporation engaged in the business of automotive and airplane financing. There were about 10 to 20 stockholders in this corporation. In 1950 Gross decided to sell out his interest in the above corporation and organize a finance company in which he would be a larger owner. Accordingly, in 1950 he sold his stock interest in Aero Credit Corporation and that year he and Burt Wilson organized the Union Finance Company (hereinafter sometimes called Union), which was formed pursuant to the Oregon Small Loan Laws and it engaged in the automobile financing business. The parties subscribed and paid for the capital stock of the said corporation as follows: Burt Wilson
$30,000
Rudolph L. Gross
15,000
Catherine D. Gross
15,000
$60,000
*234 Wilson was not interested in operating the finance company as he was steadily employed as a manager of another firm in Portland, so Rudolph L. Gross was the managing officer of Union. In his income tax returns for the years 1959, 1960 and 1961 he reported salary received from the company in the respective amounts of $24,000, $24,000 and $21,600. The Union Finance Company derived much of its financing by loans from the U.S. National Bank of Oregon at Portland, to which it discounted customers' contracts at a lower rate of interest than it charged the customers. From its inception, Union's stockholders made advances to the corporation and they were treated as loans and Union executed notes therefor bearing 8 percent or 10 percent interest but all such notes were subject to subordination agreements executed between the payees and the bank subordinating such notes to stockholders to the bank's loans. However, the stockholders' advances permitted the bank to enlarge the line of credit to Union. It is stipulated that of the $69,880.47 claimed as bad debt deductions on their 1961 income tax return the sum of $55,000 represented advances to Union and that Catherine Gross had advanced *235 $15,000 of said sum from her own funds which she had inherited and Rudolph had advanced the balance. The notes were subject to subordination agreements to the bank. Paragraph 4 of the stipulation of facts provides as follows: 4. Petitioners claimed the following advances as business bad debts in their income tax return for the taxable year 1961: Name
Amount
Chester March
$ 775.00
Jack Finley
240.00
Ros Morrison
8,884.73
Finley Steel Erectors, Inc.
2,165.44
North Bend Veneer, Inc.
2,815.30
Union Finance Company
55,000.00
$69,880.47
Respondent determined the Union Finance Company advances were nonbusiness bad debts which did not become worthless until 1962 and the other advances totaling $14,880.47 were nonbusiness bad debts in 1961, the deduction thereof being limited by sections 1211 and 1212, 1954 Code, to $1,444.33. Burt Wilson died in 1954 and his son and daughter-in-law, Mr. and Mrs. Gordon Wilson, inherited his interests. Union lost some $69,000 in 1958 and it made only $1,104.23 in 1959. It again lost in 1960 over $66,000 and dissension developed between Gross and Gordon Wilson. In May of 1961 Gordon tried to get Gross to resign from Union *236 but Gross refused. A certified public accountant was engaged by the corporation in June of 1961 to examine its affairs. The accountant's report, which was not certified, showed Union owed the United States National Bank $929,915.30 secured by notes, contracts and trust receipts due Union from its customers and also by the stockholders' subordinated notes. The report contains an analysis of the pledged collateral, and, with the assistance of management, some attempt was made to evaluate many items of the security given. The indication in the report is that the pledged collateral did not adequately secure the bank obligations. On or about October 19, 1961, Gordon Wilson filed suit against Rudolph L. Gross and Union Finance Company, seeking a receivership, accounting and injunction. Supporting said complaint, Wilson, by affidavit, swore, "[the] bank is now threatening to foreclose on the security it holds, that the financial condition of the corporation is in grave doubt." In connection with said lawsuit, a receiver was appointed who thereafter excluded Gross from occupancy of the premises of Union Finance Company. Union's income tax return for 1961 shows a loss of $155,910.23 *237 and as of December 31, 1961, the balance sheet of Union Finance Company showed a deficit of $51,014.32, computed as follows: Assets
$835,028.31
Liabilities
$826,042.63
Capital stock
60,000.00
Earned Surplus
(51,014.32)
$835,028.31
The United States National Bank continued extending the line of credit to the receiver, who continued to conduct the day-to-day operations of the company. On June 4, 1962, the bank discontinued its line of credit to the corporation, which action precipitated the receiver's recommendation to proceed with a bankruptcy reorganization or liquidate. On June 18, 1962, the Court ordered the corporation liquidated and, by December 21, 1962, its assets had been sold. With their joint income tax returns for 1960 and 1961 petitioners filed Schedule 1040C purporting to show an independent business of Rudolph L. Gross of "Loans", with the business address the same as Union or his home. In the schedule for 1960 there is the report, without any itemization, of interest received in the total sum of $3,862.39 and bad debts in the total sum of $5,506.70 and the computation of loss from the purported business of $1,644.31. In the said schedule *238 C for 1961, again, without any itemization, there is reported interest received in 1961 in the sum of $3,696.96 and bad debts in the sum of $69,880.47 and the resulting loss of $66,183.51. The returns were made out by the certified public accountant who was also the accountant for Union and had made the audit of Union in the summer of 1961. The return for 1960 appears to be undated but it is stamped received in the district director's office at Portland on May 8, 1961. During the year 1961 Gross was the holder of 3 unpaid notes representing loans he had made to the makers. One note was an unsecured note signed by Ros and Thelma Morrison. It was dated January 26, 1961, and in the amount of $8,900, with interest at the rate of 8 percent. Morrison was a used car dealer and long-time customer of Union to which he owned much money. The loan was to enable Ros to pay off another finance company and thus make the position of Union more solid. Another note was an unsecured demand note signed by Sam Osmundson for $500, with interest at 6 percent, dated August 31, 1961. Osmundson had been an employee of a customer of Union engaged in the used car business and he wanted to go into business *239 for himself. The loan was made in order to secure Osmundson as a customer for Union but it did not work out as he absconded shortly thereafter. The third note was a note for $4,000, dated January 29, 1959, signed by F. Donald and Rosemary K. Windsor payable $2,000 on January 29, 1960, and $2,000 January 29, 1961, with interest at 7 percent. The note was secured by a mortgage executed by the Windsors on their home. Petitioner Gross had loaned money in years prior to 1961 to other individuals on their promissory notes. He loaned $2,720.50 to Peter LaLonde on a note executed by Peter and his wife Delora M., dated September 7, 1956, with interest at 10 percent per annum after maturity and the note was made payable in 24 monthly installments. The note was paid in full. Another such note is a $35, 30-day 6 percent note signed by Frank G. Patterson which is dated November 22, 1960, and it is marked paid. Gross made some other advancements or payments that are represented here by his canceled checks to Arthur Lehman, Clarence and Buelah Clinton, Mary Bergdorf, Harold Keller, Gerald and Lueen Smith, L. W. Taylor, Michael P. O'Brien, Baby Furniture, Inc., North Bend Veneer Co., Hitch *240 Hiker Co., Finley Steel Erectors, Inc., Jack Finley, C. H. March, Fred Marks, Alpha Auto Sales and C. D. Kamp. The dates on the checks range from 1957 to 1962 and some of them bear the legend "loan". The checks were generally to customers of Union or to other corporations in which Gross had a substantial stock interest. There is also Gross' canceled check to Union Finance Company dated March 7, 1958, bearing the legend "Loan to Union Finance." Petitioners amended their petition at the trial to seek an increased business bad debt deduction in 1961 in the amount of approximately $30,000, based on the foregoing payments or advancements, represented by his canceled checks, being loans and some of them becoming worthless in 1961, and therefore business bad debts. Opinion We would be inclined to agree with petitioners that their loans at least to Union probably became worthless in 1961 but we agree with respondent that the record falls far short of establishing that such loans were proximately related to any individual business that petitioners were carrying on and were therefore no more than nonbusiness bad debts for which deduction was allowed by respondent as limited by section 166(d). *241 [1]
Without going into the *242 question of worthlessness, or the time when the debts became uncollectible, it was petitioner's first burden to show the existence of the debts and the proximate relationship of the debts to petitioner's trade or business. Sec. 1-166-5(b) (2), Income Tax Regs. Respondent does not question the existence in 1961 of the debts set forth in paragraph 4 of the stipulation as recited in our findings of fact but his position is that these loans and any other such loans that existed in 1961 were not created in connection with any business conducted by Gross. He does not question the 1961 worthlessness of the stipulated loans other than those to Union but we need only consider the business connection issue to decide this case. It seems to be petitioners' main position that in 1961 they were carrying on a private or individual loan business. There seems to be no contention that this private loan business existed prior to 1955 and Gross testified flatly that it did not continue after 1961. There is no question that Catherine D. Gross' advances to Union, stipulated to be $15,000 of the total $55,000 advanced by petitioners, resulted in nonbusiness losses since she was not engaged in any business *243 in 1961. She did not testify. One of the canceled checks in evidence was signed by her and stamped as drawn on her "Investment Account." The check is dated July 31, 1956 and the payee is W. B. Shively, described by Gross as merely the attorney for Alice Burke who handled a mortgage loan evidently by Catherine Gross to Alice Burke. Alice Burke's mortgage is not in evidence but Gross said it was being paid regularly with interest. This transaction would hardly put Catherine D. Gross in a private loan business. Petitioners argue Gross' activity of advancing approximately $130,000 to about 25 parties between 1955 and 1962 compels a conclusion that he was in the money lending business and therefore all of the advances which became worthless as loans in 1961 were acquired in connection with his private money lending business and were therefore business bad debts. The proof of these alleged loans and their relationship to an individual money lending business leaves much to be desired. To begin with there are only three or four interest bearing notes in a period of five or six years to witness the alleged money lending business. Petitioner says the business is evidenced by the many canceled *244 checks which he says represent interest bearing loans that he made for the dual purpose of securing interest income and to enable Union to obtain new customers and retain old ones. We ignore the $7,500 canceled check to Union in 1958. On cross-examination he said he had no recollection about this and when asked if it was not likely this was paid, he said he did not know. At any rate, the indebtedness to Union is stipulated. The loans, other than the loans to Union, were certainly not made in any business-like manner. There is a noticeable absence of the type of instruments and records usually found in the conduct of a loan business. His memory of the transactions evidenced by the canceled checks was extremely vague. At times he could remember nothing about them and he could only hazard a guess as to the amount due him. In one instance he said a series of checks to a man named Taylor represented loans but he could only estimate within $1,000 of the amount due him in 1961 from Taylor. He received and reported interest received from Union but there is but little evidence of his receipt of interest income. Petitioners reported interest from other sources received in 1958, 1959, 1960 and *245 1961 in the amounts of $5,959.43, $6,870.34, $3,862.39 and $3,696.96, respectively. But the interest on the Union loans would account for most of the interest income. Gross testified the canceled checks represented loans and he expected the borrowers to pay the obligation with interest but there is no clear testimony that these check transactions ever earned any interest. In almost every instance the money was advanced to some substantial customer of Union who was in some financial distress. A few, such as the checks to North Bend Veneer Company, Finley Steel Erectors, Baby Furniture, Inc. and The Hitch Hiker Corporation appear to be advances to equity capital rather than loans, and even if they were loans, they appear to be advances to enhance or protect an existing investment. We do not feel it necessary to discuss the many transactions in detail. Petitioners' brief merely presumes all advances to parties other than Union were loans proximately related to an individual business of Gross without specific reference to any particular transaction. We feel the record falls short of demonstrating that Gross was in a separate business of money lending in 1961. Petitioners also make *246 some argument that Gross was in a separate business of promoting and financing ventures for gain. Again petitioners do not refer to any particular transaction. It is true that petitioners had a $1,000 stock interest in Finley Steel Erectors, a $1,000 stock interest in The Hitch Hiker Company, and a $1,500 stock interest in North Bend Veneer Co. and he was the beneficial owner of one-third of the stock of Baby Furniture, Inc. He wrote checks to all of these companies which he says were loans and advancements of working capital and he argues such loans were a part of a separate business of promoting business ventures to which the loans to Union were also related. The most that could be said of all such loans is that they were designed to aid businesses in which he was an investor and such loans do not place him in a separate business of promotion or financing businesses. Whipple v. Commissioner, 373 U.S. 193 (1963). Gross also argues that the loans which were mostly to Union and Union's customers were proximately related to the business of his employment at Union Finance Company. Petitioner cites J. T. Dorminey, 26 T.C. 940 (1956), and Trent v. Commissioner, 291 F. 2d 669 *247 (C.A. 2, 1961). But the Dorminey case is not in point. There the taxpayer was in a produce business and it was held his loan to a supplier was a business loan. The case does not hold an employee's advances to or for the purpose of helping the employer become business loans of the employee. The Trent case merely holds employee loans can become business loans of the employee if they are made as a condition of the employment - a situation that is admittedly not present in this case. The fact that Gross was running a loan corporation and he was motivated by his position as an employee to make personal loans to benefit the corporation does not make such loans business loans of any business he is conducting. This is true with respect to the stipulated loans that existed in 1961 and the other payments which Gross testified were loans that became worthless in 1961 and were the subject of his amendment. Without deciding whether the payments, other than the stipulated loans, were actually loans by Gross or whether they became worthless in 1961, we hold for respondent. Even though other nonbusiness losses were not claimed in the 1961 return, the overall result would not be affected since *248 petitioner's deductions would be limited by sections 1211 and 1212 of the 1954 Code. Decision will be entered for the respondent. Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩